IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 21, 2014

**STATE OF TENNESSEE  v. LESLIE ALLEN WARE, JR.**

**Appeal from the Criminal Court for Sullivan County**
**Nos. S51538 & S52126      R. Jerry Beck, Judge**

**No. E2013-02855-CCA-R3-CD - Filed December 29, 2014**

The defendant, Leslie Allen Ware, Jr., appeals his Sullivan County Criminal Court jury convictions of conspiracy to possess 26 grams or more of cocaine with intent to sell or deliver, possession of 26 grams or more of cocaine for sale or delivery, maintaining a dwelling where controlled substances are used or sold, facilitation of theft, facilitation of conspiracy to commit robbery, and two counts of criminally negligent homicide.   The defendant received an effective sentence of 36 years.  He claims on appeal that the sentences imposed by the trial court were excessive.  Discerning no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

T. Wood Smith, Greeneville, Tennessee, for the appellant, Leslie Allen Ware, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Barry P. Staubus, District Attorney General[1]; and Joseph Eugene Perrin, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In December 2005, the Sullivan County Criminal Court grand jury charged the defendant with one count each of conspiracy to possess 26 grams or more of cocaine with intent to sell or deliver, possession of over 26 grams or more of cocaine for sale or delivery,

---

[1]A significant time elapsed between issuance of the indictments and the trial.  H. Greeley Wells, Jr. was the Sullivan County District Attorney General when the defendant was charged in this case in 2005.

and maintaining a dwelling where controlled substances are used or sold. In May 2006, the grand jury charged the defendant with two counts of first degree premeditated murder, two counts of felony murder, and one count each of especially aggravated robbery and conspiracy to commit aggravated robbery. All charges arose out of the November 18, 2005 drug-related shooting deaths of Jeffrin Nolan and Terrance Alexander and the robbery of Mr. Nolan. In March 2008, the State filed a notice with the trial court that it was seeking the death penalty against the defendant, but the State later withdrew that notice prior to trial. The trial court conducted a two-week jury trial in July 2013.

The evidence presented by the State at trial established that the defendant, a New York native, was involved in a cocaine distribution ring headed by O'Sheene Massey, who was also originally from New York. The defendant, along with his cousin, Clyde Green, Jr., O'Sheene Massey's brother, Jawaune Massey, Brian Beco, and Octavia Brooks,[2] sold cocaine for O'Sheene Massey. On November 1, 2005, the group moved into a residence located at 404 Holly Point in Johnson City that had been leased by Rita Massey, the sister of O'Sheene and Jawaune Massey. Witnesses described the house as having six bedrooms: on the top floor, Mr. Beco occupied the first bedroom, Mr. Green had the second bedroom, and Ms. Brooks resided in the third bedroom, and on the bottom floor, the first bedroom belonged to Ms. Massey's infant son, the second bedroom was occupied by Ms. Massey and the defendant, and the third bedroom was shared by O'Sheene Massey and his girlfriend, Thelma Gardner.

O'Sheene Massey purchased his cocaine from both a connection in New York and Mr. Nolan. Because Mr. Nolan was known to have the best prices, Mr. Massey preferred to purchase cocaine from him.

Mr. Nolan's girlfriend, Ashley Adams, testified that Mr. Nolan opened the Solé Candle Shop in Kingsport in March 2005 as a front for his cocaine sales operation. Mr. Nolan sold candles and incense in the front of the shop, and he sold cocaine out of the back room of the shop. Mr. Nolan kept a handgun inside a drawstring bag inside a box underneath the cash register in the front room. According to Ms. Adams, customers would telephone Mr. Nolan with their request for cocaine, and Mr. Nolan would retrieve the requested amount of cocaine from a drawer located in the back room. For male customers, Mr. Nolan would keep his handgun on his person during the drug transaction, but he would leave his weapon inside the box if the customer was female. Mr. Nolan always insisted that his drug customers purchase an item from the candle shop, and Mr. Nolan would then place the drugs inside the bag with the customer's candle purchase.

---

[2]By the time of trial, Octavia Brooks was married, and she gave her married name as Octavia Wilson.

Ms. Adams testified that Mr. Nolan typically sold approximately four ounces of crack cocaine each day and that the drugs were packaged in plastic bags. Mr. Nolan would keep the cash from the cocaine sales in his pocket, and he kept approximately $132 in the cash register for customers who came to purchase candles. Although Mr. Nolan did not usually allow customers to accompany him into the back room, he made an exception for Ms. Brooks because, according to Ms. Adams, Mr. Nolan "knew her on a different level than drug dealing, so it was different with her."

Mr. Beco, Mr. Green, and Ms. Gardner all testified that they overheard O'Sheene Massey, Jawaune Massey, and the defendant in the Holly Point residence discussing plans to rob Mr. Nolan. According to Mr. Beco, the three men also discussed whether they should kill Mr. Nolan, and they ultimately decided that "he should die." At some point prior to November 16, 2005, Mr. Green accompanied O'Sheene Massey and Ms. Brooks to the candle shop to purchase cocaine. After they gave Mr. Nolan their money, Mr. Nolan proceeded alone to the back room and returned with the cocaine; Mr. Green noticed that Mr. Nolan had a handgun in his back pocket. Mr. Nolan then told Mr. Massey that he would have to purchase a candle. As the group was leaving the shop, Mr. Massey remarked to Mr. Green that Mr. Nolan was "a snitch."

On November 16, 2005, O'Sheene Massey, Jawaune Massey, Mr. Green, and the defendant returned to the candle shop. According to Mr. Green, he learned while en route to the shop that the group intended to rob Mr. Nolan. Ms. Adams was at the candle shop that day, and she saw O'Sheene Massey and a man she later identified as the defendant inside the shop. Ms. Adams testified that the two men stayed at the shop for a short time before leaving. O'Sheene Massey apparently decided to abort the robbery because other customers were present in the shop.

On November 18, Mr. Green, who had spent the night elsewhere, returned to the Holly Point residence around 8:00 a.m. and encountered O'Sheene Massey and the defendant in the driveway of the residence discussing obtaining drugs from Mr. Nolan. Mr. Green drove the defendant and O'Sheene Massey in an older model grey Lincoln to pick up Jawaune Massey from another location, and the four men drove to Kingsport. While en route, O'Sheene Massey contacted Mr. Nolan to place his order for crack cocaine. The men in the Lincoln also discussed sending Ms. Brooks into the shop first as a decoy.

Meanwhile, Ms. Adams arrived at the candle shop around 3:30 p.m. and stayed for approximately ten minutes. Terrance Alexander, one of Mr. Nolan's regular drug customers, was present in the shop while she was there. Ms. Adams delivered 4 ounces of crack cocaine and $400 cash to Mr. Nolan before she left. Ms. Adams testified that she was certain Mr. Nolan was wearing a necklace and a pinky ring that day.

Sometime after Ms. Adams left the candle shop, Casey Chambers, who lived across the street from the shop, saw an older model grey vehicle park on the street near her house. A short time later, she saw a black Toyota 4Runner park behind the grey car. Mr. Beco was driving the 4Runner, in which his girlfriend, Crystal Arnold, and Ms. Brooks were passengers. Mr. Green was driving the grey Lincoln; O'Sheene Massey was seated in the front passenger seat; Jawaune Massey was seated on the left side of the back seat; and the defendant was seated on the passenger side of the back seat. Ms. Chambers identified at trial all four of the men from the Lincoln as well as Ms. Brooks.

Ms. Chambers watched the defendant walk to the 4Runner and get into the backseat. According to Mr. Beco, O'Sheene Massey called his cellular telephone when Mr. Beco parked behind the Lincoln and told Mr. Beco that the group was planning to rob Mr. Nolan. When the defendant entered Mr. Beco's vehicle, the defendant stated that they planned to "stick" Mr. Nolan, which Mr. Beco interpreted to mean that the group intended to rob Mr. Nolan. When the defendant returned to the Lincoln, he told the occupants that Ms. Brooks would enter the shop first and that the defendant and Jawaune Massey would follow her inside. Ms. Chambers testified that Ms. Brooks walked to the candle shop, followed by the defendant and Jawaune Massey.

According to Ms. Brooks, she entered the candle shop, gave Mr. Nolan her money, and sat down in the front room to wait for the drugs. Mr. Nolan proceeded to the back room. The defendant and Jawaune Massey then entered the shop, both armed with handguns. Ms. Brooks recalled that one of the men told Mr. Alexander, "'You know what this is,'" and they instructed Ms. Brooks to leave the shop. As she was leaving, she passed Mr. Green entering the shop. Mr. Green saw no one in the front room. He entered the back room, where he saw Mr. Nolan and Mr. Alexander lying face down on the floor. Mr. Green observed Jawaune Massey standing in the doorway holding two guns, one of which belonged to Mr. Nolan, and he saw the defendant pointing a gun at Mr. Nolan's head. Mr. Nolan was insisting that "he didn't have no more drugs and they got everything." According to Mr. Green, the defendant fired the first shot at Mr. Nolan. As Mr. Green was leaving the candle shop, he heard two more gunshots, but he did not see who fired those shots. Mr. Beco, Mr. Green, Ms. Brooks, and Ms. Chambers all testified similarly to the manner in which the three men exited the candle shop and the way in which the group sped away in the two vehicles.

Law enforcement officers who were dispatched to the candle shop shortly after the shooting discovered the victims lying face down and side by side in a large pool of blood. Mr. Nolan was deceased, and Mr. Alexander died a few hours later at the hospital. The autopsy of Mr. Nolan revealed that he sustained two gunshot wounds to the back of the head with "extensive damage to the skull and the brain." Mr. Alexander's autopsy revealed that he sustained a single gunshot wound to the back of the head. The manner of death for both

victims was ruled as homicide. Kingsport Police Department Detective David Joe Cole discovered an empty drawstring bag inside a white cardboard box beneath the candle shop's cash register; $174.36 inside the cash register; and a set of digital scales in the back room of the candle shop. A drawer that had been pulled out in the back room contained no cash or cocaine, and no cocaine or cash was found on Mr. Nolan's body. In addition, officers found no weapons anywhere in the shop.

Meanwhile, the defendant and the others returned to the Holly Point residence. The group gathered in the bedroom shared by the defendant and Ms. Massey where, according to Mr. Green, the defendant threw cash and bags of crack cocaine onto the bed. According to Ms. Gardner, who had been home all day, there were four "balls" of crack cocaine and $4,100 in cash. Both Mr. Green and Mr. Beco testified that the defendant argued with O'Sheene and Jawaune Massey over the division of the money and drugs. Mr. Green testified that the defendant wanted "half" because "he did most of the work."

Later that night, Mr. Beco drove the defendant, O'Sheene Massey, and Ms. Brooks to Virginia, where the defendant and Ms. Brooks bought bus tickets to New York. Mr. Beco noticed that the defendant was wearing "a rose gold chain with a cross on it" and "a ring," and Ms. Brooks testified that the chain and ring belonged to Mr. Nolan.

Ms. Chambers identified O'Sheene Massey and Ms. Brooks from photographic lineups, which eventually led officers to the Holly Point residence, where they located the grey Lincoln and the black 4Runner. A search of the residence revealed, among other things, numerous firearms, plastic bags containing an "off-white substance," and $2,028 in cash located between a mattress and box springs. Special Agent and forensic scientist Glen Jay Glenn with the Tennessee Bureau of Investigation testified that he examined the cocaine recovered from the Holly Point residence and that it weighed over 45 grams. In February 2007, the defendant was arrested in New York City and extradited to Sullivan County.

With this evidence, the State rested. Following the trial court's denial of the defendant's motion for judgments of acquittal and a *Momon*[3] colloquy, the defendant elected to testify.

The defendant admitted selling crack cocaine for O'Sheene Massey, but he categorically denied any involvement in the November 18, 2005 robbery and murders at the candle shop. According to the defendant, he never resided at the Holly Point residence. Instead, he claimed that he lived with his girlfriend, Mary Dennis, and that he would occasionally spend the night with his other girlfriend, Ms. Massey, at Holly Point. The

---

[3] *See Momon v. State*, 18 S.W.3d 152, 161-62 (Tenn. 1999).

defendant estimated that he spent five nights at Holly Point with Ms. Massey between November 1 and November 18, 2005, and he testified that he kept no clothing or personal items at Holly Point. The defendant stated that, on November 18, he spent the day at the Holly Point residence with Ms. Massey and her young son and Ms. Gardner and her young daughter.

Based on this evidence, the jury convicted the defendant as charged of conspiracy to possess 26 grams or more of cocaine with intent to sell or deliver; possession of 26 grams or more of cocaine for sale or delivery; and maintaining a dwelling where controlled substances are used or sold. In addition, the jury convicted the defendant of the lesser included offenses of facilitation of theft of property valued at $1,000 or more but less than $10,000, facilitation of conspiracy to commit robbery, and four counts of criminally negligent homicide.

The trial court conducted a sentencing hearing on November 22, 2013. The State entered into evidence the defendant's presentence report, which established that the defendant had prior convictions of robbery, petit larceny, criminal impersonation, and assault. In addition, the report indicated that the defendant, as a juvenile in New York, had been charged with the felony offense of criminal possession of a weapon that had been defaced for concealment purposes and that he had received a sentence of one to three years. The defendant also violated the terms of his probation in New York due to marijuana usage and was placed in a juvenile detention center. The trial court made note of the fact that the defendant, in both his trial testimony and sentencing hearing testimony, "stuck by his saying that all he did while he was here in Tennessee was basically sell drugs . . . in addition to selling drugs before he came to Tennessee in the city of New York."

In determining the defendant's sentence, the trial court found that four enhancement factors were applicable: the defendant had a previous history of criminal convictions; the defendant had previously failed to comply with sentencing conditions involving release into the community; the defendant possessed or employed a firearm during the commission of the offense; and the defendant had been adjudicated to have committed a delinquent act as a juvenile that would constitute a felony if committed by an adult. *See* T.C.A. § 40-35-114(1), (8), (9), (16). The trial court then found "that the appropriate sentence . . . would be the maximum sentence allowed by law." With respect to sentence alignment, the court found the defendant to be "a professional criminal who has notably devoted himself to . . . criminal acts as a major source of livelihood"; that the defendant "is an offender whose record of criminal activity is extensive"; and that the defendant "is a dangerous offender whose behavior indicate[s] little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high." *See* T.C.A. § 40-35-115(b)(1), (2), (4). The trial court merged the alternate counts of criminally

negligent homicide into two counts, ordered that all sentences be served consecutively to one another, and sentenced the defendant as a standard offender to 12 years each for conspiracy to possess 26 grams or more of cocaine and possession of 26 grams or more of cocaine for resale; four years for maintaining a dwelling where controlled substances are used or sold; and two years each for facilitation of theft of property valued at $1,000 or more but less than $10,000, facilitation of conspiracy to commit robbery, and both counts of criminally negligent homicide, for a total effective sentence of 36 years.

Following the denial of his timely motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant raises no issues pertaining to his convictions, arguing only that the sentences imposed by the trial court were excessive. Specifically, the defendant contends that the trial court improperly imposed top-of-the-range sentences for each conviction and that the trial court abused its discretion by ordering consecutive service of all sentences. The State counters that the record fully supports the trial court's sentencing decision in this case.

Our supreme court has adopted an abuse of discretion standard of review for sentencing and has prescribed "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise* at 706 n.41 (citing T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709.

In the instant case, the record reflects that the trial court, in sentencing the defendant, considered all appropriate principles set forth in Code section 40-35-210(b). The court orally placed on the record the enhancement factors it considered when determining the defendant's sentence. In imposing the maximum sentence for each conviction, the trial court was not required to find the presence of any statutory enhancement factors. *See* T.C.A. § 40-35-210(c)-(e); *Bise*, 380 S.W.3d 698. It did, however, find that four enhancement factors were applicable, none of which the defendant challenges on appeal and all of which are supported by the evidence. As such, we find no abuse of discretion in the trial court's decision to sentence the defendant to the statutory maximum for each conviction.

With respect to consecutive sentencing, our supreme court has held that the standard of review adopted in *Bise* "applies similarly" to the imposition of consecutive sentences, "giving deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013). In *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995), the supreme court imposed two additional requirements for consecutive sentencing when the "dangerous offender" category is used: the court must find that consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal conduct. *Id.* at 937-39; *see State v. Imfeld*, 70 S.W.3d 698,707-08 (Tenn. 2002).

Here, the trial court based its decision to order consecutive sentencing on findings that the defendant was a professional criminal who had chosen to devote his life to criminal acts in order to support himself, that the defendant had an extensive history of criminal activity, and that the defendant was a dangerous offender. *See* T.C.A. § 40-35-115(b)(1), (2), (4). The trial court noted that the defendant, through his own admissions at trial and at the sentencing hearing, supported himself solely by selling drugs during his time in Tennessee and that he had sold drugs during his time in New York as well. The presentence report established that the defendant, who was 35 years of age at the time of trial, had an extensive criminal history that spanned nearly 20 years. Although the trial court failed to make the requisite *Wilkerson* findings in relying on the dangerous offender category, the trial court's additional findings that the defendant was a professional criminal with an extensive criminal history, are amply supported by the record and are sufficient to warrant the imposition of consecutive sentences. *See State v. Adams*, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997).

The defendant argues that the trial court's failure to specify the standard on which it based its decision to order consecutive sentencing constitutes an abuse of discretion. We disagree. Without question, the record supports a finding by a preponderance of the evidence that the defendant had an extensive criminal history and had knowingly devoted his life to crime as his primary means of support, and we find no abuse of discretion in the trial court's decision to impose consecutive sentencing.

The defendant also contends that the trial court's decision to order consecutive service of "each and every drug charge sentence" amounts to "judicial vindictiveness." The defendant's reliance on the principle of judicial vindictiveness, however, is misplaced because it is only applicable when a more severe sentence has been imposed upon retrial following a successful appeal. *See North Carolina v. Pearce*, 295 U.S. 711, 725-26 (1969); *State v. Gilliam*, 901 S.W.2d 385 (Tenn. Crim. App. 1995). Because this case does not

involve a retrial, judicial vindictiveness does not apply.

Finally, the defendant argues that, because the convictions of conspiracy to possess 26 grams or more of cocaine with intent to sell or deliver, possession of 26 grams or more of cocaine for sale or delivery, and maintaining a dwelling where controlled substances are used or sold "were so closely intertwined that the imposition of a total of 28 years in prison is unconscionable" and that the three sentences should therefore be served concurrently. Our supreme court, however, has held as follows:

> We reject petitioner's argument that in determining whether to sentence a defendant to consecutive sentences, the trial judge is required to take into consideration the fact that all of the offenses arose out of one single criminal episode or were inspired by the same general intent and minutely limited in both time and space.

*Gray v. State*, 538 S.W.2d 391, 393 (Tenn. 1976) (citations omitted). The trial court's decision to impose consecutive sentences for the defendant's three drug-related convictions was not improper.

Because we find no abuse of discretion attendant to the trial court's sentencing determinations in this case, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE